**Affirmed; and Opinion Filed April 23, 2013.**



In The

**Court of Appeals**

**Fifth District of Texas at Dallas**

_____

**No. 05-12-00509-CR**
_____

**JEFFERY LEON TATUM, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 382nd Judicial District Court**
**Rockwall County, Texas**
**Trial Court Cause No. 2-11-127**

## OPINION

Before Justices Francis, Lang, and Evans
Opinion by Justice Lang

Following a plea of not guilty, appellant Jeffery Leon Tatum was convicted by a jury of theft in the amount of $1,500 or more, but less than $20,000. Punishment was assessed by the jury at eighteen months' confinement and a fine of $5,000. In three issues on appeal, appellant contends (1) the evidence is legally insufficient to support his conviction, (2) the trial court abused its discretion by allowing testimony during the punishment phase of trial respecting twenty to thirty additional thefts, and (3) he received ineffective assistance of counsel. We decide appellant's three issues against him. The trial court's judgment is affirmed.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Appellant was indicted for the charged offense based on three thefts that occurred at a Walmart store in Rockwall, Texas, on three different dates. Prior to trial, the State gave appellant written notice of its intent to introduce evidence that appellant committed

"approximately 12" other theft offenses in a similar manner at Walmart stores in the Dallas/Fort Worth area, including two offenses at stores in Grand Prairie.

During the guilt/innocence phase of trial, Joseph Wesley Alexander testified he is the asset protection manager at a Walmart store in Rockwall. He stated that one of his responsibilities is to "oversee internal theft." Alexander testified that on January 10, 2011, associates at the store reported to him that a door alarm on a fire exit at the back of the store near the automotive department had "gone off" and an individual had pushed a shopping cart containing a television out the door, then carried the television into a minivan driven by another individual. Alexander stated he investigated the scene and observed the fire exit door standing wide open and a shopping cart "right outside" the door. Further, Alexander testified that (1) on January 11, 2011, and January 16, 2011, respectively, two additional televisions were stolen from the store in a similar manner and (2) an attempted theft of another television from the store in a similar manner occurred on February 2, 2011.

According to Alexander, Justin Kampe, an asset protection associate who worked directly under him, reported the three thefts and the attempted theft to police. Alexander testified Kampe was a "representative" of Walmart at that time and "had more right to the property on behalf of Walmart than [appellant] did." Further, Alexander testified appellant was not given permission to take the property in question without paying for it.

Alexander stated the store has multiple video surveillance cameras at various locations inside and outside. He testified those cameras recorded "different events" in the course of the thefts on January 10, January 11, and January 16. Alexander stated he collected video footage pertaining to each theft from multiple cameras and compiled that footage into three videos for police (the "compilation videos"). The compilation videos of the January 10, January 11, and January 16 thefts were admitted into evidence and published to the jury. The compilation videos

continuously showed the date, camera location, and time in hours, minutes, and seconds. During publication, Alexander described what was shown in each scene of the compilation videos. Further, Alexander testified that the three televisions stolen in the thefts shown on the videos were valued at $698, $1,248, and $688, respectively.

The compilation videos of the January 10 and January 11 thefts each showed an individual in a dark jacket and dark pants being dropped off at the front of the store in the late afternoon by a second individual driving a light-colored minivan. The person driving the minivan then drove to the back of the store and parked near the back fire exit. The person inside the store selected a television, placed it in a shopping cart, and proceeded to the fire exit. After pushing the cart through the fire exit, the person who had entered the store loaded the television into the waiting minivan and both persons left in the minivan with the television. Alexander testified that a store employee who witnessed the January 10 theft described the minivan to him as a "teal/silverish" minivan and provided a "partial" vehicle plate number consisting of three characters. Further, Alexander testified that in his notes respecting the January 10 theft, he described the vehicle as a "Mazda." Alexander stated that on January 11, Kampe was able to obtain a full vehicle plate number, 544HCJ, which "matched up" to the partial plate number obtained on January 10.

In the compilation video of the January 16 theft, one person arrived alone at the store driving a light-colored minivan. The person backed the vehicle into a parking space at the back of the store in the same area where the minivan had been parked during the two previous thefts. Then, the person walked around to the front of the store, entered the store, selected a television and placed it in a shopping cart, exited through the back fire exit, placed the television in the minivan, and drove away. The person was dressed in dark clothing. At one point during the video, while the person was pushing the shopping cart containing the television through the

–3–

store, the person looked toward a security camera and a partial view of his face was visible. A "still shot" of that image was introduced and admitted into evidence.

Alexander testified that after the January 16 theft, he spoke with police about doing a "closer watch" of the back area of the store and watching for the vehicle involved. He stated that on February 2, 2011, he heard "a call over the walkie" that the alarm on the back fire exit had been activated. He hurried to that location and found a television in a shopping cart inside the fire exit door. He testified the fire exit door was frozen shut due to sleet and ice. According to Alexander, there was no video surveillance footage from that day because the video system was inoperable as a result of power outages.

On cross-examination, Alexander testified the minivan in the compilation videos "does look similar to a Dodge van." However, as a result of "working backwards from February the 2nd to link up the vehicle" to the other three dates, he now knows it was a Mazda.

Officer Christopher Campbell of the Rockwall Police Department testified he responded to calls from the Walmart in question respecting the January 10 and January 16 thefts. He stated that the vehicle involved in those two thefts was described to him by Kampe as a "silver Dodge Caravan." Further, Campbell testified the suspect in the January 16 theft was described to him by Kampe as a black male wearing dark clothing. According to Campbell, the January 10 theft occurred at approximately 4:30 p.m. and the January 16 theft occurred at approximately 5:30 p.m.

Officer Mike Otto of the Rockwall Police Department testified he responded to a call from the Walmart in question regarding a theft in progress on January 11, 2011. He stated the suspect had left by the time he arrived. Otto testified Kampe told him that he thought the vehicle involved was a Dodge Caravan. According to Otto, "[s]omewhere in the course of the theft from the day before, someone was able to come up with a license plate for the vehicle," which was

–4–

described to him by Kampe as 544HCJ.  Otto testified that plate number was forwarded to police detectives so they could "run it" and it "came back to a Cadillac."

Sergeant Andy Villareal of the Rockwall Police Department testified that on February 2, 2011, he was cruising through the parking lot of the Walmart store in question on the lookout for a "silver-type" minivan believed to be connected with several recent thefts.  He stated he noticed a silver minivan backed into a parking space on the west side of the building.  He testified the vehicle had no front license plate, but the back license plate matched the number listed in the description he had been given.  Villareal stated he "ran the vehicle tag" and "[i]t came back to a Cadillac."  He testified he called for additional officers and "sat up on the van, waiting for somebody to return to it."

Villareal stated that eventually a man headed toward the vehicle and got into the driver's seat.  Then, Villareal and several other officers approached him.  The man was "wearing dark clothing."  Villareal testified the man was appellant and identified appellant in the courtroom.  Villareal said he and the other officers arrested appellant on "an outstanding warrant out of Collin County" for "criminal nonsupport," then transported appellant to the Rockwall police station to speak with a detective.  Villareal stated he was able to get a different license plate number from the registration sticker on the vehicle's windshield.  Villareal "ran" that license plate number and it "came back to Juanita Marie Tatum."  On cross-examination, Villareal testified the minivan appellant was sitting in when Villareal and the other officers approached him on February 2 was a Mazda and not a Dodge Caravan.

Officer Jackie Shouse of the Rockwall Police Department testified that on February 2, 2011, he responded to a call to conduct surveillance on a silver Mazda minivan that was parked near the automotive department of the Walmart in question.  He testified police suspected the driver of the vehicle had been involved in the theft of several televisions.  According to Shouse,

police planned to "set up in the parking lot so we could try to catch the suspect coming out." Shouse testified that once the suspect was in the minivan, he pulled up in front of the minivan so the suspect was unable to leave. Shouse and other officers "got the suspect out of the car" and identified him as appellant. Then, Shouse conducted an inventory search of the minivan. Shouse stated the third-row seats had been "laid down flat to where it was just a big, open cargo area in the rear of the van."

Officer David Valliant of the Rockwall Police Department testified he assisted with the detention of appellant at the Walmart in question on February 2, 2011. Valliant testified that at the time he detained appellant, appellant had exited the store and was in his vehicle. Valliant stated appellant's vehicle was "some sort of minivan" and was parked near the automotive department. While waiting for additional officers to arrive, Valliant asked appellant several questions. Valliant testified appellant told him that he lived in Dallas and had come to Rockwall because he was interested in checking the price of an oil change for his vehicle and planned to go fishing. However, Valliant stated appellant had no fishing equipment and "didn't look dressed like someone who's looking for a place to fish."

Detective Jalena Page of the Rockwall Police Department testified she was assigned to investigate the thefts in question in January 2011. She stated she viewed the surveillance videos provided by Alexander and interviewed appellant at the police station after his arrest for "criminal nonsupport" on February 2, 2011. She stated appellant told her that "he had not committed any thefts and that he loaned his vehicle to a friend and it must have been the friend that stole all the TVs." She testified appellant refused to provide the name of his friend and did not respond to any of her other questions. Page testified that based on her investigation, she made the decision to proceed with charges against appellant in this case. She stated she believes appellant is "one and the same person as shown on that surveillance video stealing those TVs."

During closing argument in the guilt/innocence phase of trial, defense counsel argued, in part,

> [The State] had the burden of proof. We don't have to prove anything. And as horrible as it sounds, I just have to state that they didn't prove their case beyond a reasonable doubt. And if they haven't done that, you must find [appellant] not guilty.

Following the jury's finding of guilt, the punishment phase of trial commenced. Alexander was recalled by the State and his testimony during the punishment phase of trial included, in part, the following exchange:

| | |
|---|---|
| [STATE]: | . . . And I'm sure in the first part of the trial everyone was kind of wondering why there were so many police officers that responded to this one, if you want to say, shoplifter in Walmart. Would you—the problem—or this particular MO, these types of thefts, extended beyond the Rockwall store; is that right? |
| [ALEXANDER]: | Yes, ma'am. |
| [STATE]: | Okay. Could you just give the jury a sense of the nature of the problem here? |
| [DEFENSE]: | Your Honor, I object to the hearsay. I think he's gonna testify to something that he did not personally observe on a Walmart—I believe they call it the— |
| THE COURT: | Well, I guess he can testify from personal knowledge, but so far I haven't heard anything yet that would bring that objection— |
| [DEFENSE]: | I believe she's just asked him to talk about cases—situations in another Walmart. |
| THE COURT: | Y'all approach the bench just a second. |

At that point, a "discussion" occurred "off the record." Immediately following that unrecorded discussion, Alexander testified asset managers from Walmart stores in the Dallas/Fort Worth area routinely work together to prevent thefts by using a system called the "BOLO system" to

share information by email.[1]  Alexander stated that based on information on the BOLO system, approximately ten different Walmart stores in the area had experienced thefts similar to those appellant was found guilty of committing.  Alexander testified his "guesstimate" was that approximately twenty to thirty similar offenses had occurred within those ten stores.  He stated those offenses began in approximately mid-December 2010 and "ended directly the time the subject was detained by Rockwall."  Further, Alexander stated that photographs sent to him via the BOLO system pertaining to thefts in Walmart stores in Lewisville and Garland showed the same vehicle and suspect as in this case.

During closing arguments in the punishment phase of trial, defense counsel argued "this is a probation case" and requested probation.  Additionally, defense counsel stated in part, "Prison is not a—you know, liars and thieves deserve to go to prison.  We've talked about the economy. . . . Costs a lot of money to house a prisoner.  Let's try to make this positive, put him—make him pay for probation."

Following the assessment of punishment described above, appellant filed a timely motion for new trial in which he asserted in part that the evidence is "insufficient to support the verdict and judgment."  The motion was overruled by operation of law.  This appeal timely followed.

## II. APPELLANT'S ISSUES

### A. Sufficiency of the Evidence

#### 1. Standard of Review

In reviewing a challenge to the sufficiency of the evidence, we examine all the evidence in the light most favorable to the verdict and determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012).  This

---

[1] "BOLO" was described in earlier testimony by Alexander as standing for "be on the lookout."

standard recognizes the responsibility of the fact-finder "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. Because the trier of fact is the sole judge of the witnesses' credibility and the weight to be given their testimony, we defer to the fact-finder's credibility and weight determinations. *See id*. at 326. We determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011). We must presume that the fact-finder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326; *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012). Direct and circumstantial evidence are treated equally. *Sorrells*, 343 S.W.3d at 155 (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)). Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Id*.

### 2. Applicable Law

A person commits the offense of theft if he unlawfully appropriates property with intent to deprive the owner of the property. *See* TEX. PENAL CODE ANN. § 31.03(a) (West 2011). Appropriation of property is unlawful if it is without the owner's effective consent. *Id*. § 31.03(b). When multiple thefts are committed pursuant to one scheme or continuing course of conduct, whether from the same or several sources, the conduct may be considered as one offense and the amounts aggregated in determining the grade of the offense. *See id*. § 31.09.

The State is required to prove beyond a reasonable doubt that the accused is the person who committed the crime charged. *See Roberson v. State*, 16 S.W.3d 156, 167 (Tex. App.—Austin 2000, pet. ref'd). The State may prove a defendant's identity by either direct or circumstantial evidence, coupled with all reasonable inferences from that evidence. *Gardner v.*

*State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009) (citing *Earls v. State*, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986)).

### 3. Analysis

In his first issue, appellant contends the evidence is insufficient to support his conviction "because the identity of the perpetrator was not established." Appellant asserts (1) neither the "person who makes the exits at the back door" nor "the person shown carrying the respective television sets on the parking lot" is identifiable in the compilation videos; (2) "[n]o surveillance video was clear enough to show the vehicle license plate number"; (3) "Kampe, stated to be the person who obtained a license plate number after the second offense, was not available for cross-examination" and "it may have been yet another, unnamed, employee from whom Kampe supposedly obtained his information"; (4) Kampe "incorrectly identified the suspicious vehicle as a Dodge Caravan"; and (5) Alexander "became aware that the vehicle was a Mazda, not a Dodge," only as a result of "working backwards" after appellant's arrest on February 2. According to appellant,

> Without proof that Appellant was the person who took the televisions out the back door and the person who placed the sets in the vehicle, the evidence is insufficient. Proof that the vehicle at the 4th incident site was owned by Appellant's wife is not proof Appellant operated that vehicle for the three January thefts. The missing witness's license plate number evidence links only to the February 2 arrest date and vehicle but no offense occurred on that date. The "working back" from there is not a sustainable theory proving guilt.

The State responds that appellant's argument "largely ignores the state's ability to prove its case by circumstantial evidence" and "deeply discounts the jury's role in assigning weight and credibility to the testimony and evidence presented." According to the State, "[t]he common scheme used in each theft, combined with license plate information, registration information, video and photographic evidence and third party identification are legally sufficient proof of appellant's identity."

–10–

The record shows the jury viewed compilation videos of three thefts that each occurred at the Walmart in question in the late afternoon, involved a light-colored mininvan, and were committed by a man of the same build and skin color wearing dark clothing. In each of those thefts, a television was removed through the back fire exit near the automotive department in a shopping cart. Alexander testified that a store employee who witnessed the January 10 theft described the minivan to him as a "teal/silverish" minivan and provided a "partial" vehicle plate number consisting of three characters. Following the January 11 theft, a full license plate number that "matched up" to the partial license plate number was provided to police by Kampe. That license plate number matched the license plate on a silver minivan being driven by appellant on February 2 and registered to "Juanita Marie Tatum." When police "ran" the number on the license plate, it "came back to a Cadillac." On February 2, the silver minivan being driven by appellant was parked near the automotive department of the store with the third-row seats folded down. On that same date, the alarm on the back fire exit door sounded and a television in a shopping cart was found just inside the fire exit door, which was frozen shut.

Additionally, the record shows that during the January 16 theft, the suspect looked toward a security camera and a partial view of his face was visible. The jury was shown a "still shot" of that image and appellant was identified in the courtroom by Villareal. Further, Page testified (1) appellant told her "he loaned his vehicle to a friend and it must have been the friend that stole all the TVs," but appellant refused to provide the name of his friend and (2) based on her investigation, she believes appellant is "one and the same person as shown on that surveillance video stealing those TVs."

Identity can be proven by either direct or circumstantial evidence, coupled with all reasonable inferences from that evidence. *Gardner*, 306 S.W.3d at 285; *Earls*, 707 S.W.2d at 85; *see also Hooper v. State*, 214 S.W.3d 9, 16 (Tex. Crim. App. 2007) ("an inference is a

–11–

conclusion reached by considering other facts and deducing a logical sequence from those facts"). On this record, we conclude the cumulative force of the evidence when viewed in the light most favorable to the verdict supports a finding that appellant was the perpetrator of the thefts in question. *See Sorrells*, 343 S.W.3d at 155; *Gardner*, 306 S.W.3d at 285; *see also Conyers v. State*, 864 S.W.2d 739, 740–41 (Tex. App.—Houston [14th Dist.] 1993, pet. ref'd) (although complainant did not identify defendant as perpetrator and identification evidence consisted solely of videotape in which defendant claimed he was not identifiable, still photos from videotape, and testimony of third party not present at time of offense that person in videotape was defendant, evidence was sufficient to support conviction for aggravated robbery).

We decide against appellant on his first issue.

### B. Evidence of Other Thefts

### 1. Standard of Review and Applicable Law

The admissibility of evidence at the punishment stage of a trial is governed by article 37.07 of the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07 (West 2006). Section 3(a)(1) of that article provides in pertinent part:

> [E]vidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing, including but not limited to . . . evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act.

*Id*. § 3(a)(1). Further, section 3(g) states

> On timely request of the defendant, notice of intent to introduce evidence under this article shall be given in the same manner required by Rule 404(b), Texas Rules of Evidence. If the attorney representing the state intends to introduce an extraneous crime or bad act that has not resulted in a final conviction in a court of record or a probated or suspended sentence, notice of that intent is reasonable only if the notice includes the date on which and the county in which the alleged crime or bad act occurred and the name of the alleged victim of the crime or bad act. The requirement under this subsection that the attorney representing the state

–12–

give notice applies only if the defendant makes a timely request to the attorney representing the state for the notice.

Id. § 3(g).[2] "To trigger the State's obligation to comply with the notice requirement in article 37.07, a defendant may: (1) serve the State with a request for notice, or (2) file a discovery motion requesting the court to order such notice and secure a ruling thereon." *Henderson v. State*, 29 S.W.3d 616, 625 (Tex. App.—Houston [1st Dist.] 2000, no pet.) (citing *Mitchell v. State*, 982 S.W.2d 425, 427 (Tex. Crim. App. 1998)).

A trial court's ruling as to the admissibility of evidence under article 37.07 is reviewed under an abuse of discretion standard. *See Mitchell v. State*, 931 S.W.2d 950, 953 (Tex. Crim. App. 1996). The trial court abuses its discretion by admitting evidence only when the decision lies outside the zone of reasonable disagreement. *Davis v. State*, 329 S.W.3d 798, 803 (Tex. Crim. App. 2010).

As a prerequisite to presenting a complaint for appellate review, the record must show (1) "the complaint was made to the trial court by a timely request, objection, or motion" that "stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context" and (2) the trial court "ruled on the request, objection, or motion, either expressly or implicitly," or "refused to rule on the request, objection, or motion, and the complaining party objected to the refusal." TEX. R. APP. P. 33.1(a). The complaint on appeal must comport with the objection at trial. *See Dixon v. State*, 2 S.W.3d 263, 273 (Tex. Crim. App. 1998). "An objection stating one legal basis may not be used to support a different legal theory on appeal." *Rezac v. State*, 782 S.W.2d 869, 870 (Tex. Crim. App. 1990); *see Camacho*

---

[2] Texas Rule of Evidence 404(b) provides that reasonable notice must be given in advance of trial when requested. *See* TEX. R. EVID. 404(b).

*v. State*, 864 S.W.2d 524, 533 (Tex. Crim. App. 1993) (hearsay and relevancy objections at trial did not preserve complaint that testimony in question placed inadmissible extraneous offense before the jury); *Batiste v. State*, 217 S.W.3d 74, 82 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (relevancy objection in trial court did not preserve complaint that testimony in question should be excluded as extraneous offense evidence). Further, Texas law requires a party to continue to object each time inadmissible evidence is offered. *See Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003).

### 2. Analysis

In his second issue, appellant contends the trial court abused its discretion by allowing testimony during the punishment phase of trial respecting twenty to thirty extraneous offenses at other Walmart stores in the Dallas/Fort Worth area. According to appellant, such evidence was (1) hearsay, (2) "unduly prejudicial and without probative value," and (3) "grossly insufficient" to prove appellant committed the extraneous offenses beyond a reasonable doubt. Further, appellant argues the State did not provide proper notice of its intent to introduce evidence of other crimes as required by article 37.07 § 3(g).

The State asserts in part that "the error, if any, is not properly preserved for review." Additionally, the State contends appellant "did not request notice of prior offenses as required by article 37.07 § 3(g)."

The record shows that prior to trial, the State gave appellant notice of its intent to introduce evidence that appellant committed "approximately 12" other theft offenses in a similar manner at Walmart stores in the Dallas/Fort Worth area, including two offenses at stores in Grand Prairie. During direct examination in the punishment phase of trial, Alexander was asked to "give the jury a sense of the nature of the problem here" respecting "these type of thefts." Before Alexander could respond, defense counsel objected on the ground of hearsay and stated

–14–

"I think he's gonna testify to something that he did not personally observe on a Walmart—I believe they call it the—." The trial court stated, "Well, I guess he can testify from personal knowledge, but so far I haven't heard anything yet that would bring that objection—." Defense counsel replied, "I believe she's just asked him to talk about cases—situations in another Walmart." Then, a "discussion" occurred "off the record." Immediately following that unrecorded discussion, Alexander testified respecting (1) the BOLO system and how it operates and (2) information on that system pertaining to thefts at other Walmart stores. The record shows no further objection by defense counsel as to that testimony.

Appellant does not explain, and the record does not show, how his initial hearsay objection "stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint." *See* TEX. R. APP. P. 33.1. Moreover, to the extent the record can be construed to show appellant objected on hearsay grounds to testimony respecting "cases—situations in another Walmart," appellant does not direct this Court to any portion of the record that shows a ruling by the trial court on that hearsay objection, and we have found none. *See id*. Accordingly, we conclude appellant's hearsay complaint was not preserved for appellate review. *Id*.; *see also Martinez*, 98 S.W.3d at 193. Further, any hearsay objection by appellant in the trial court did not preserve for review the complaint he asserts on appeal respecting inadmissibility of the extraneous offense evidence in question based on article 37.07 § 3(a)(1). *See Camacho*, 864 S.W.2d at 533; *Rezac*, 782 S.W.2d at 870; *Batiste*, 217 S.W.3d at 82; *see also* TEX. CODE CRIM. PROC. ANN. art. 37.07 § 3(a)(1).

Additionally, appellant acknowledges in his appellate brief that notice of the State's intent to introduce evidence of other crimes pursuant to article 37.07 "does not appear on the record to have been requested by defense counsel." However, appellant asserts, "[t]he evidence actually elicited differed from the notice of intent to introduce extraneous offense: 12 in the

notice, 20–30 in the testimony; Grand Prairie offenses in the notice, Lewisville and Garland in the testimony." Appellant asks this Court to "deem the defense counsel request to be moot where the State furnishes the notice without a request" and hold the State to the standard required in article 37.07 § 3(g). Appellant argues that "[o]therwise the State could furnish notices not in compliance with the statute simply by filing an early notice." Even assuming without deciding that appellant's complaint respecting notice pursuant to article 37.07 was preserved for this Court's review, appellant cites no authority in support of his position, and we have found none. *See* TEX. R. APP. P. 38.1(i); *see also* TEX. CODE CRIM. PROC. ANN. art. 37.07 § 3(g) ("The requirement under this subsection that the attorney representing the state give notice applies only if the defendant makes a timely request to the attorney representing the state for the notice."); *Henderson*, 29 S.W.3d at 625 ("To trigger the State's obligation to comply with the notice requirement in article 37.07, a defendant may: (1) serve the State with a request for notice, or (2) file a discovery motion requesting the court to order such notice and secure a ruling thereon.").

We decide appellant's second issue against him.

### C. Ineffective Assistance of Counsel

#### 1. Standard of Review and Applicable Law

To prevail on a claim of ineffective assistance of counsel, an appellant must show counsel's representation fell below an objective standard of reasonableness and there is a reasonable probability the results of the proceedings would have been different in the absence of counsel's errors. *Strickland v. Washington*, 466 U.S. 668, 687–688, 694 (1984); *Goodspeed v. State*, 187 S.W.3d 391, 392 (Tex. Crim. App. 2005). The appellant bears the burden of proving ineffective assistance of counsel by a preponderance of the evidence. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). Failure to make the required showing of either deficient performance or sufficient prejudice defeats an ineffectiveness claim. *See Andrews v.*

–16–

*State*, 159 S.W.3d 98, 101 (Tex. Crim. App. 2005). An ineffective assistance claim must be "firmly founded in the record," and the record must affirmatively demonstrate the claim has merit. *Menefield v. State*, 363 S.W.3d 591, 592 (Tex. Crim. App. 2012).

## 2. Analysis

In his third issue, appellant contends he received ineffective assistance of counsel. Specifically, appellant complains "(1) counsel told the jury it was 'horrible' to raise the issue of proof of guilt beyond a reasonable doubt, when reasonable doubt appeared to be the primary issue in Appellant's favor" and "(2) counsel stated 'prisons are for thieves' when the jury had just determined Appellant was guilty of three (3) thefts and counsel otherwise argued Appellant should receive probation." According to appellant,

> It is not possible to say to what extent the jury may have given weight to the points above. Appellant can only say that the statements were potentially damaging in the jury's eyes, coming from Appellant's own counsel, and a rationale for making the statements is not apparent.
> Appellant understands the entire case must be reviewed; however, these statements alone could have adversely affected Appellant on the punishment issue. A precise assessment of their actual effect on the jury's punishment is not capable of determination.

The State asserts appellant failed to meet either prong of the *Strickland* test. According to the State, (1) "[t]he record is silent as to the underlying reasons for defense counsel's actions and decisions" and (2) "[t]he two comments forming the basis of appellant's ineffective assistance claim do not establish that counsel's performance was deficient or that the result of the proceeding would have been different."

As described above, appellant's burden on his ineffective assistance of counsel claim includes, in part, showing by a preponderance of the evidence that there is a reasonable probability the results of the proceedings would have been different in the absence of counsel's alleged errors. *See Strickland*, 466 U.S. at 694. However, appellant's argument on this issue consists solely of citation to the complained of statements in the record followed by the

–17–

assertions quoted above, including (1) "[i]t is not possible to say to what extent the jury may have given weight to the [statements of counsel complained of]" and (2) "[a] precise assessment of [the statements'] actual effect on the jury's punishment is not capable of determination." On this record, we conclude appellant has not met his burden under *Strickland* to show a reasonable probability of a different outcome absent the alleged errors. *See id.*

We decide against appellant on his third issue.

### III. CONCLUSION

We decide appellant's three issues against him. The trial court's judgment is affirmed.

/Douglas S. Lang/
DOUGLAS S. LANG
JUSTICE

Do Not Publish
Tex. R. App. P. 47.2
120509F.u05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JEFFERY LEON TATUM, Appellant

No. 05-12-00509-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 382nd Judicial District Court, Rockwall County, Texas
Trial Court Cause No. 2-11-127.
Opinion delivered by Justice Lang,
Justices Francis and Evans participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 23rd day of April, 2013.

/Douglas S. Lang/

DOUGLAS S. LANG
JUSTICE